**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 20 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

FIRST SECURITY BANK, of New
Mexico, N.A.,

    Plaintiff-Counter-Defendant-
    Appellant,

       v.

PAN AMERICAN BANK,

    Defendant-Counter-Claimant-
    Cross-Defendant-Appellee,

       v.

1ST STATE INVESTMENT CO.;
MATHER FEDERAL CREDIT
UNION; JOHN P. McGOVERN
FOUNDATION,

    Defendants-Counter-Claimants-
    Cross-Claimants-Appellees,

NEW MEXICO BANKERS
ASSOCIATION,

    Amicus Curiae.

No. 98-2073

FIRST SECURITY BANK, of New Mexico, N.A.,

    Plaintiff-Counter-Defendant-Appellee,

    v.

PAN AMERICAN BANK,

    Defendant-Counter-Claimant-Cross-Defendant-Appellant,

    v.

1ST STATE INVESTMENT CO.; MATHER FEDERAL CREDIT UNION; JOHN P. McGOVERN FOUNDATION,

    Defendants-Counter-Claimants-Cross-Claimants,

NEW MEXICO BANKERS ASSOCIATION,

    Amicus Curiae.

No. 98-2091

---

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CIV-94-1464-LH)

---

John A. Adams, of Ray, Quinney & Nebeker, Salt Lake City, Utah, (Scott H. Clark and Douglas M. Monson, of Ray, Quinney & Nebeker, Salt Lake City, Utah; and Gordon S. Little, of Gordon S. Little, P.A., Albuquerque, New Mexico, with him on the brief), for the plaintiff/counter-defendant/appellant/appellee First Security Bank of New Mexico, N.A.

2

John G. Baugh, of Eaves, Bardacke & Baugh, P.A., Albuquerque, New Mexico, for the defendants/counter-claimants/cross-claimants/appellees 1st State Investment Co., and John P. McGovern Foundation.

Robert A. Johnson (Karla K. Poe with him on the brief), of Eastham, Johnson, Monnheimer & Jontz, P.C., Albuquerque, New Mexico, for the defendant/counter-claimant/cross-defendant/appellant/appellee Pan American Bank.

Barkley Clark, of Shook, Hardy & Bacon, L.L.P., Kansas City, Missouri, on the brief for New Mexico Bankers Association, amicus curiae.

---

Before **EBEL, McKAY**, and **BRISCOE**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

First Security Bank (First Security) appeals the district court's entry of summary judgment in favor of Pan American Bank (Pan American), and the court's assessment of liability on three counterclaims. Pan American cross-appeals the district court's calculation of damages. We reverse the entry of summary judgment in favor of Pan American and the judgments in favor of 1st State Investment Co. (1st State) and John P. McGovern Foundation (McGovern).

I.

On August 3, 1994, Beatrice Stonebanks, in the name of her business "Benjamin, Maxwell & Co. Corp.," opened a business savings account at First Security. She was assigned account number 033015363 and she designated the account "Jumbo CD Account." On the day Stonebanks opened the account, Pan

3

American wired $495,000 to First Security. The wire described the beneficiary as First National Bank (First Security's former title) and identified the account number as 033015363. Pan American believed it was purchasing a CD from First Security, not that it was transferring funds to Benjamin Maxwell which in turn would purchase the CD.

First Security receives and processes wires by means of a semi-automated wire processing system denominated "WireNet," which itself interfaces with FedWire, the Federal Reserve Bank's wire system. An incoming wire is received by WireNet and a hard copy of the wire instructions is automatically printed. Without human interaction, WireNet verifies that the beneficiary account number identified in the wire instructions matches a valid account number at First Security. WireNet ignores any named beneficiary listed in the wire instructions. When a wire is received, a First Security employee removes the hard copy of the wire from the printer, goes to his or her computer terminal, and generates a copy of the wire on a monitor by striking a key on the computer keyboard. The employee types in a department code and then strikes two keys on the keyboard. If the account number identified in the wire matches a valid First Security account number, WireNet accepts the wire when the last key is struck. An error message is displayed if the system does not accept the wire. After a wire is processed, a bank employee customarily places a courtesy call to the beneficiary,

4

advising that the wire has been received and the funds have been credited to the beneficiary's account.

It is not disputed that Bobby Quintana accepted the Pan American wire and credited the account. Although he had no actual recollection of the wire, he conceded in his deposition that his handwritten initials in the corner of the wire indicated he had processed it. Quintana did not make the courtesy call to Stonebanks because he could not find a phone number for the account. He took the hard copy of the wire to Nancy Abeyta, his supervisor, who telephoned the branch office where Stonebanks had opened the account and asked an employee of that office to inform the account holder that $495,000 had been wired and deposited into the account.

On November 8, 1994, 1st State wired $99,000 to First Security. The wire identified the beneficiary as "1st State Investment Jumbo CD" and account number 033015363. On November 9, McGovern wired $99,000 to First Security. The wire identified the beneficiary as "John P. McGovern Foundation" and account number 033015363. Both 1st State and McGovern believed they were purchasing CDs directly from First Security. Curtis Garcia, an employee of First Security, received both wires, credited the account, and made courtesy calls to Stonebanks.

On November 29, First Security became aware of the fraudulent scheme. It

immediately froze Stonebanks' accounts, filed an interpleader action under 28 U.S.C. § 1335, and deposited $305,877.12 (the cumulative amount of Stonebanks' accounts with First Security) with the Registry of the United States District Court for the District of New Mexico. All of the adverse claimants (Pan American, 1st State, and McGovern) filed counterclaims against First Security under N.M. Stat. Ann. § 55-4A-207, which governs a bank's liability when a wire transfer misdescribes a beneficiary. Under the statute, if a bank has actual knowledge that the wire identifies two different beneficiaries (one by name and a different one by account number), the originator of the wire may have a right to recover from the bank. The adverse claimants here charged that First Security had actual knowledge that the wires identified different beneficiaries but processed the wires and released the funds to Stonebanks without further inquiry.

After discovery, the parties filed cross-motions for summary judgment. The district court entered summary judgment in favor of Pan American on its counterclaim against First Security. The court ruled that First Security had actual knowledge that the Pan American wire identified two different beneficiaries. The court based its ruling on Quintana's deposition testimony that he knew only savings accounts began with "0" (here, the account number in question was 033015363) and a bank (First National Bank, First Security's former title, was the named beneficiary) could not have a savings account. The court denied 1st

6

State's and McGovern's summary judgment motions, finding material issues of fact remained. After a bench trial, the district court found First Security had actual knowledge that the 1st State and McGovern wires identified different beneficiaries. The court reasoned First Security obtained such knowledge when Garcia made the customary courtesy calls.

II.

Rights and liabilities for payment orders, or wire transfers, are governed by Article 4A of the Uniform Commercial Code, codified in New Mexico at N.M. Stat. Ann. § 55-4A-101 *et seq*. Article 4A was crafted with the express purpose of creating – in an age of increasing automation – inflexible rules of liability for wire transfer disputes. See id. § 102, Official Comment (stating that a "deliberate decision" was made to "use precise and detailed rules to assign responsibility"). Such bright-line rules are necessary so that parties to the millions of annual wire transfers may "predict risk with certainty, . . . insure against risk, . . . adjust operational and security procedures, and . . . price funds transfer services appropriately." Id.

Section 55-4A-207 governs liability when a wire transfer misdescribes a beneficiary. A misdescription occurs when a wire identifies a beneficiary by name and account number and the name and account number identify different persons or entities. In these circumstances, liability of a beneficiary's bank is

7

dependent on whether the bank, with actual knowledge of the conflict, paid the order to a person not entitled to receive the funds.

> (b)  If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply:
> (1)  Except as otherwise provided in Subsection (c), if the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order.  The beneficiary's bank need not determine whether the name and number refer to the same person.
> (2)  If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer.  If no person has rights as beneficiary, acceptance of the order cannot occur.

Id. § 55-4A-207(b).

As noted, § 55-4A-207(b) was designed with automated wire transfer services in mind.  In a fully automated system, computer software identifies the account number on an incoming wire, searches the bank's system for a matching account number, and credits the account if a match is found.    Id., Official Comment 2.  The efficiency benefits of an automated system are undermined if a bank is not able to rely on its automated system but must independently verify there is no conflict between a beneficiary name and an account number.  Thus, the drafters of § 55-4A-207 clarified that although it is possible for the beneficiary's bank to determine whether the name and number refer to the same

8

person, it "has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary of the order."     Id. Significantly, the statute "is not limited to cases in which processing is done by automated means. A bank that processes by semi-automated means or even manually may rely on number as stated in Section 4A-207."     Id.

Although a bank has no duty to affirmatively search for conflicts between beneficiary names and account numbers of incoming wires, it may not escape liability if, before it pays the wire, it gains knowledge of the conflict by any means but nonetheless pays an individual who is not entitled to receive the funds. "Knowledge" means actual knowledge, not constructive knowledge, and is determined at the time of payment.     Id.

### III.

First Security contends the district court erred in granting summary judgment in favor of Pan American because there were genuine issues of material fact as to whether First Security had actual knowledge that the wire identified conflicting beneficiaries. The district court ruled that First Security through its employee Quintana had actual knowledge at the time the Pan American wire was paid. The first beneficiary was identified by name as First Security and the second beneficiary was identified by account number 033015363. First Security asserts the district court applied an improper constructive knowledge legal

9

standard and usurped the function of the factfinder by improperly weighing conflicting evidence and drawing inferences to conclude Quintana had actual knowledge of a discrepancy.

We review the grant of summary judgment de novo, applying the same legal standard applied by the district court. See Wolf v. Prudential Ins. Co., 50 F.3d 793, 796 (10th Cir. 1995). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, we examine the factual record in the light most favorable to the nonmoving party. See Wolf, 50 F.3d at 796.

First Security initially argues the district court applied an improper constructive knowledge standard rather than an actual knowledge standard in determining First Security's liability under § 55-4A-207. However, First Security does not identify any statements made by the court at the summary judgment hearing or in its ruling that support a belief that the standard was merely "should have known." The record and the district court's order reflect the court's understanding that the statute requires actual knowledge. The court specifically ruled "that, based upon his testimony, Mr. Quintana had actual knowledge at the

10

time he received the wire that it identified two different persons as the beneficiary and that he could not tell who the real beneficiary was of the account number." App. at 1314. The court also stated that under § 55-4A-207, "knowledge is defined . . . to mean actual knowledge." Id.

The more difficult issue is whether the district court properly found there were no genuine issues of material fact regarding Quintana's actual knowledge of the discrepancy. In support of its bench ruling, the court identified the following purportedly undisputed material facts: (1) The Pan American wire identified two beneficiaries on its face; (2) Quintana's admitted usual practice was to look "at the entire line which designated the destination for the wire transfer"; (3) at his deposition, Quintana could not identify the beneficiary of the Pan American wire because of the discrepancy; (4) if a wire does not indicate a name, Quintana uses the account number to obtain a name and phone number to make a courtesy call; (5) Quintana obtains the name and phone number before accepting the wire; (6) Quintana could not obtain the name and phone number of the holder of account number 033015363 so he "went to Nancy Abeyta with respect to the issue in question"; and (7) Quintana accepted the wire and "deposited it in the account of Benjamin Maxwell." Id. at 1312-13. The district court did not address that Quintana did not recall processing the Pan American wire. From these facts, the court reasoned:

11

I conclude that, based upon his testimony, Mr. Quintana had actual knowledge at the time he received the wire that it identified two different persons as the beneficiary and that he could not tell who the real beneficiary was of the account number. Quintana stated that the First National Bank could not be the beneficiary because it is a savings account, which that bank could not have. He also testified that, as he looked at it during the deposition, it raised a question in his mind, he did not have the name to go with the account. It's clear also that he knew that there was a problem with the transfer, but he did nothing to resolve that problem.

. . . [Section 4A-207] places or states the rationale for the result which First Security would want based upon an automatic transfer. I don't think that's what this is. I don't believe it is an automatic transfer, or an automated transfer. And in any event, I conclude that subsection (b)(2) of Section 207 applies, and I conclude that the beneficiary bank . . . knew that the name and number identified different persons.

Id. at 1314-15.

First Security contends, and we agree, that in granting summary judgment the district court ignored relevant contrary evidence in the record and inappropriately drew inferences in favor of the moving party. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. at 255. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id.

12

Contrary to the district court's ruling, it is not clear that Quintana's usual practice was to look "at the entire line which designated the destination for the wire transfer." At his deposition, Quintana testified that when the bank received a wire, he would "walk over to the printer where it printed, tear it off the printer, walk back to my desk, and input it." App. at 143. He indicated that as he returned to his desk (a few feet away), he would look "to see who it's for, that it does have an account number and that . . . the format is correct." Id. Quintana conceded that it was not uncommon for numerous wires to be waiting at the printer and he "usually just [read] the top one" as he returned to his desk. Id. at 146. There is no evidence in the record to suggest, and Quintana did not recall, that the Pan American wire was the only wire at the printer when Quintana retrieved it or, if it was not the only wire, if the Pan American wire was on top. Because one could reasonably infer that Quintana did not read the Pan American wire, the district court erred in drawing the inference in favor of Pan American, the moving party. See Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1322-23 (10th Cir. 1987) ("Where different, ultimate inferences may be drawn from the evidence presented by the parties, the case is not appropriate for summary judgment.")

Even if Quintana's deposition testimony could be read to compel the conclusion that he looked at the Pan American wire, another impermissible

13

inference is required to conclude he actually knew of the discrepancy. Liability attaches only if Quintana actually knew the named beneficiary and the beneficiary account number identified different persons. See N.M. Stat. Ann. § 55-4A-207, Official Comment 2. A rational factfinder could infer that Quintana read the wire but did not discover the discrepancy. Quintana testified that if he had discovered a discrepancy, he would not have paid the wire without obtaining the account holder's name and phone number from the computer system and phoning to verify that the account holder was expecting a wire. [1] App. at 144. Yet the only indication that Quintana did in fact attempt to obtain the account holder's name and phone number *before* inputting the Pan American wire was his statement that upon discovering a discrepancy he normally would have followed such a procedure. As noted, Quintana had no actual recollection either way with respect to the Pan American wire.

Moreover, the deposition testimony of Nancy Abeyta, Quintana's

---

[1] The district court apparently relied on this testimony to conclude that Quintana typically obtained the name and phone number of the account holder and made a courtesy call before processing a wire. We read Quintana's deposition testimony to say that he would follow this process only if he discovered a discrepancy. As for his routine practice in processing a typical wire, his testimony is conflicting and ambiguous. Quintana testified at one point that when he did not notice a discrepancy, he obtained the name and phone number and made the call as he processed the wire; at another point he testified that he obtained the name and phone number and made the courtesy call after he processed the wire. See App. at 146, 624.

supervisor, suggested that Quintana inputted the wire before the courtesy call was made, which is inconsistent with Quintana's self-described process upon discovery of a discrepancy. Abeyta testified that Quintana brought the wire to her because he could not locate a phone number to make the courtesy call. Abeyta testified that First Security had not entered the information into its computer system because it was a new account. When Abeyta received the wire, both Quintana's and Garcia's initials appeared in the corner of the wire, indicating the wire had been inputted by Quintana and reviewed by Garcia. From this evidence, a rational jury could infer that Quintana received the wire and processed it without noticing a conflict and then took the wire to Abeyta so she could track down the account name and phone number and make the courtesy call.

Material factual disputes remain as to (1) whether Quintana looked at the beneficiary line of the Pan American wire; (2) if so, whether he noticed the beneficiary name and number were in conflict; and (3) if the wire was paid before or after Quintana or any other First Security employee obtained actual knowledge of any such conflict. The district court erred in granting summary judgment in favor of Pan American.

IV.

First Security contends the district court erred in concluding that payment

15

of the 1st State and McGovern wires did not occur when the account was credited and the funds were made available for withdrawal, but when the courtesy phone calls were made to Stonebanks. The court held the wires were paid "no earlier than the time at which [a First Security] employee notified Ms. Stonebanks of receipt of each of those orders." App. at 951. The court found that merely crediting her account did not constitute making the funds otherwise available to her, despite uncontradicted evidence that the beneficiary had immediate access to the funds as soon as the wires were processed. Id. We review de novo the district court's interpretation of N.M. Stat. Ann. § 55-4A-405, which governs payment of wire transfers. See Horace Mann Ins. Co. v. Johnson, 953 F.2d 575, 576 (10th Cir. 1991) (reviewing district court's interpretation and application of state law de novo).

As noted, the presence or absence of actual knowledge is determined when the wire transfer is paid. See N.M. Stat. Ann. § 55-4A-207, Official Comment 2. Payment of a wire transfer to a beneficiary is a term of art governed by N.M. Stat. Ann. § 55-4A-405(a), which provides:

> If the beneficiary's bank credits an account of the beneficiary of a payment order, payment of the bank's obligation . . . occurs when and to the extent (i) the beneficiary is notified of the right to withdraw the credit, (ii) the bank lawfully applies the credit to a debt of the beneficiary, or (iii) funds with respect to the order are

16

otherwise made available to the beneficiary by the bank. [2]

It is clear from the plain language of the statute that crediting an account is not always sufficient to constitute payment. It is not so clear that crediting an account is *never* sufficient to constitute payment. In this respect, First Security asserts that crediting a beneficiary's account may constitute payment under the "otherwise made available" prong of the statute if, when the account is credited, the beneficiary may immediately withdraw the credited funds.

In rejecting First Security's contention, the district court relied on § 55-4A-405, Official Comment 1, and on a hypothetical found at 3 James J. White and Robert S. Summers, Uniform Commercial Code , § 23-4, at 33 (4th ed. 1995). At first glance, it appears these authorities considered and rejected First Security's position.

> This section defines when the beneficiary's bank pays the beneficiary and when the obligation of the beneficiary's bank under Section 4A-404 . . . to pay the beneficiary is satisfied. In almost all cases the bank will credit an account of the beneficiary when it receives a payment order. In the typical case the beneficiary is paid when the beneficiary is given notice of the right to withdraw the credit.

N.M. Stat. Ann. 55-4A-405, Official Comment 1. Similar reasoning is applied in

---

[2] It is important to note that acceptance of the wire by the beneficiary's bank is different than payment of the wire by the beneficiary's bank to the beneficiary. Acceptance is governed by N.M. Stat. Ann. § 55-4A-209; payment is governed by N.M. Stat. Ann. §§ 55-4A-404 & 405. Acceptance and payment may (or may not) occur at the same time under these sections.

17

resolving the following hypothetical:

> (i) 9:00 A.M., Beneficiary's bank receives payment order directing Beneficiary's bank to credit Beneficiary's account for $1M.
> (ii) 9:10 A.M., Beneficiary's bank credits Beneficiary's account.
> (iii) 9:15 A.M., Beneficiary's bank notifies Beneficiary of the right to withdraw credit.
> Barring a deposit contract which states otherwise . . . acceptance occurs at 9:15 A.M.

White & Summers, supra, at 33.

At first glance, these explanations seemingly contemplate the situation presented here – a bank credit to a beneficiary's account followed by notice to the account holder. A closer look, however, reveals at least one important difference. In this case, unlike the above examples, First Security notified Stonebanks not to inform her she had the right to withdraw the credited funds (as envisioned by 55-4A-405(a)(i)), but simply to inform her the wire had been received and credited to her account (as required by N.M. Stat. Ann. § 55-4A-404(b)). Aside from this factual distinction, the above comments are ambiguous when considered in context and in conjunction with the Expedited Funds Availability Act. As First Security notes, neither Official Comment 1 nor the White & Summers hypothetical indicates if the bank crediting the beneficiary's account makes the funds immediately available to the beneficiary or places a hold on the funds for a specified period of time, as permitted by federal law. The Expedited Funds Availability Act and its accompanying regulations require banks

18

to make available to an account holder funds received by wire transfer no later than the next business day following the business day on which the transfer was received. 12 C.F.R. § 229.10(b).

We cannot ascertain from the plain statutory language why funds are not "otherwise made available" to a beneficiary and why payment does not occur when a beneficiary's bank credits a beneficiary's account and immediately makes the funds available to the beneficiary. See Tony M. Davis, Comparing Article 4A With Existing Case Law on Funds Transfers: A Series of Case Studies, 42 Ala. L. Rev. 823, 873 (1991) (concluding that when wired funds were placed in beneficiary's account and immediately made available to beneficiary, bank "paid" beneficiary under 4A-405(a)). The drafters of Article 4A intended that payment coincide with the beneficiary's receipt of a benefit from the payment order. See N.M. Stat. Ann. § 55-4A-405, Official Comment 1. Allowing the beneficiary the right to withdraw certainly qualifies as a benefit to the beneficiary, even if the right is not immediately exercised. As White & Summers stated in their discussion of acceptance and payment under Article 4A, "[f]unds are typically 'made available' to a beneficiary by allowing the beneficiary the right to withdraw." White & Summers, supra, § 23-4, at 32.

This interpretation gives effect to all of the provisions of § 55-4A-405(a) without rendering any of those provisions redundant or equating the mere

19

crediting of an account with payment. A bank that credits a beneficiary's account but holds withdrawal of funds pending notice of the credit to the beneficiary, application of the funds to a debt of the beneficiary, actual withdrawal by the beneficiary, or the mere passage of time does not bestow a benefit upon a beneficiary. The beneficiary has obtained neither a benefit from the transfer nor a right to use the funds. However, a bank that makes wire funds available simultaneously with an account credit bestows an immediate benefit upon the beneficiary, regardless of any subsequent notice to the beneficiary of the credit.

1st State and McGovern contend the "credits an account" language in § 55-4A-405(a) was intended to reach both credits in which funds are immediately made available to the beneficiary and credits in which funds are held until the next business day. If true, crediting an account, regardless of the consequences, is alone insufficient to constitute payment. We reject this contention, which gives little meaning to subsection (a)(iii) (which provides payment occurs when and to the extent "funds with respect to the order are otherwise made available to the beneficiary by the bank"). If releasing funds to a beneficiary when an account is credited does not constitute making funds available to the beneficiary, we are hard pressed to concoct a scenario that does. The only indication given by the drafters of Article 4A as to the meaning of (a)(iii) is found in the following comment:

20

[T]he beneficiary's bank can accept a payment order by paying a beneficiary. In the normal case of crediting an account of the beneficiary, payment occurs when the beneficiary is given notice of the right to withdraw the credit, the credit is applied to a debt of the beneficiary, or "funds with respect to the order" are otherwise made available to the beneficiary. The quoted phrase covers cases in which funds are made available to the beneficiary as a result of receipt of a payment order for the benefit of the beneficiary but the release of funds is not expressed as payment of the order. For example, the beneficiary's bank might express a release of funds equal to the amount of the order as a "loan" that will be automatically repaid when the beneficiary's bank receives payment by the sender of the order. If the release of funds is designated as a loan pursuant to a routine practice of the bank, the release is conditional payment of the order rather than a loan, particularly if normal incidents of a loan such as the signing of a loan agreement or note and the payment of interest are not present. Such a release of funds is payment to the beneficiary under Section 4A-405(a). Under Section 4A-405(c) the bank cannot recover the money from the beneficiary if the bank does not receive payment from the sender of the payment order that is accepted.

N.M. Stat. Ann. § 55-4A-209, Official Comment 5.

The comment suggests that payment under the "otherwise made available" prong occurs where a beneficiary's bank credits the beneficiary's account and releases funds to the beneficiary on the condition that the funds are a loan. Because the bank has accepted the order, § 55-4A-405(c) not only obligates the bank to pay the beneficiary regardless of whether or not the release of funds is characterized as a loan, but precludes the bank from later collecting the funds from the beneficiary if the sender's bank does not pay. In other words, such "conditional" payments by the beneficiary's bank to the beneficiary are not

21

enforceable. As relevant here, however, the critical point is that under the scenario constructed in the comment, payment is effective even if subsequent notice is not given to the beneficiary. If, "pursuant to a routine practice of the bank," the funds are released when the beneficiary's account is credited, the situation is no different than the situation here. An order is received, the beneficiary's account is credited, the funds are released to the beneficiary and made available for immediate withdrawal, and payment occurs. [3]

1st State and McGovern also argue that a beneficiary does not receive a benefit from the credit, even if the funds immediately are made available, unless the beneficiary has knowledge of the credit. This ignores the fact that by the

---

[3] Not surprisingly, Comment 5 is susceptible to a different interpretation. The comment explains that the first clause of subsection (a)(iii) ("funds with respect to the order") "covers cases in which funds are made available to the beneficiary as a result of receipt of a payment order for the benefit of the beneficiary but the release of funds is not expressed as payment of the order." Here, the release of funds by First Security was expressed as payment of the order. Thus, it could be argued that subsection (a)(iii) applies only to releases of funds by a bank where the bank mischaracterizes the release of funds as a loan or other debt instrument to avoid Article 4A's risk of loss provisions regarding acceptance and payment. We do not believe such a narrow interpretation of subsection (a)(iii) is appropriate. First, the fact that the subsection "covers" cases where funds are made available to the beneficiary but not expressed as payment of the transfer is no indication that the subsection only covers such cases. The hypothetical in the comment depicts one of many situations in which funds otherwise could be made available to the beneficiary of a wire transfer. Second, there is no substantive distinction between making funds available to the beneficiary under the guise of a loan (which is considered payment of the order and not a loan in any event) and making funds available to the beneficiary with the express concession that release of the funds constitutes payment of the order.

22

terms of § 55-4A-405 notice is merely one of the methods by which payment occurs. See 6A William D. Hawkland & Lary Lawrence, Uniform Commercial Code Series § 4A-405:01 (1993 & Supp. 1999) ("Subsection 4A-405(a)(iii) discharge of the subsection 4A-404(a) obligation by making the funds otherwise available to the beneficiary does not literally require the beneficiary bank to give notice to the beneficiary, unlike subsection 4A-405(a)(i).") Notice (and thus knowledge of the credit on the part of the beneficiary) is not required to effectuate payment if the beneficiary gains a benefit by having the funds applied to a debt of the beneficiary or if the funds otherwise are made available to the beneficiary. Moreover, whether funds are immediately available to an account holder following a credit is generally not a matter within the scope of Article 4A, but, assuming compliance with other federal regulations, is a matter of contract between the beneficiary's bank and the beneficiary. Hence, a beneficiary will have knowledge beforehand that any time the beneficiary's account is credited the funds are immediately available for use.

As 1st State and McGovern point out, N.M. Stat. Ann. § 55-4A-404(b) specifically requires that a bank "notify the beneficiary of receipt of the order before midnight of the next funds-transfer business day following the payment date." Notification under 404(b) is unrelated to the separate provisions of § 55-4A-405 governing payment. As such, while the notice required by 404(b) may

23

also constitute payment under 405(a)(i), it is not the event that constitutes payment if, before notice is given, either of the events described in 405(a)(ii) and (iii) have occurred. As previously noted, our review of the record persuades us that First Security's "courtesy calls" were intended to satisfy the notice required by 404(b), rather than as a final step to effective payment under 405(a)(i).

In summary, we hold that payment may occur under § 55-4A-405(a)(iii) when a beneficiary's account is credited and the funds immediately are made available to the beneficiary. This interpretation is consistent with the plain language of 405(a) and gives effect to all of its provisions. [4]

## V.

We REVERSE the entry of summary judgment in favor of Pan American. We REVERSE the district court's legal ruling that payment does not occur under N.M. Stat. Ann. § 55-4A-405(a)(iii) when a beneficiary's account is credited and the funds immediately are made available for withdrawal by the beneficiary and REMAND to the district court for further proceedings. We decline to consider Pan American's cross-appeal regarding damages as the issues may not arise on remand.

---

[4] We have found only one case on the precise issue before this court. In Aleo Int'l, Ltd. v. Citibank, 612 N.Y.S. 2d 540, 541 (1994), a New York trial court ruled that payment occurred upon credit to an account. The court did not explain its reasoning.

24