[No. B164022. Second Dist., Div. Five. Dec. 9, 2004.]

TME ENTERPRISES, INC. et al., Plaintiffs and Appellants, v. NORWEST CORPORATION et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of Parts C(2), C(3), D, and E of the Discussion.

1022

**COUNSEL**

Jeffrey Licht & Associates and Jeffrey L. Licht for Plaintiffs and Appellants.

Buchalter, Nemer, Fields & Younger and Debra Solle Healy for Defendants and Respondents.

## OPINION

**MOSK, J.**—Plaintiffs and appellants TME Enterprises, Inc. and James L. McDaniel (appellants) appeal from a judgment, following a court trial, in favor of defendants and respondents Norwest Bank Colorado (Norwest Bank or the Bank), Norwest Services, Inc. (NSI), and Norwest Corporation[1] (collectively respondents) in appellants' consolidated actions for violation of subpart B of the Federal Reserve Board's Regulation J (12 C.F.R. §§ 210.25–210.32 (2004)[2] (Regulation J), which incorporates Uniform Commercial Code (UCC) article 4A (12 C.F.R. § 210.25(b))[3] and which governs wire transfers through the Fedwire system;[4] fraud; negligence; civil conspiracy; civil RICO[5] violations; unfair business practices and other state and federal causes of actions.[6] Appellants contend that substantial evidence does not support the trial court's findings that Norwest Bank did not violate Regulation J; that respondents were not liable for negligence, civil conspiracy, civil RICO violations, and unfair business practices; and that respondents were not liable as alter egos of each other. Appellants further contend that they are entitled to a new trial because the trial court failed to enforce a March 6, 2001 discovery order requiring Norwest Bank to produce certain documents.

In the published portion of this opinion, we hold that pursuant to Regulation J, which is applicable to this transaction, a bank accepting an incoming wire transfer of funds that specifies both an account number and a named beneficiary may rely on the account number even if the named beneficiary does not hold the account identified by the designated number, so long as the bank does not have actual knowledge of that inconsistency; that actual knowledge of such an inconsistency does not exist unless bank personnel handling the transaction are aware that the name of the owner of the account number designated in the wire bears no resemblance to, and has nothing in common with, the named beneficiary; and that, without reaching any issue of preemption, there is substantial evidence to support the trial court's conclusion that the bank did not act negligently in accepting the wire

---

[1] Norwest Bank is now known as Wells Fargo Bank West, N.A.; NSI is now known as Wells Fargo Services Company; and Norwest Corporation is now known as Wells Fargo & Co.

[2] All references to the Code of Federal Regulations are to the 2004 edition. Regulation J has not been amended since the time of the transactions at issue in this case.

[3] UCC article 4A is also set forth in appendix B to subpart B of 12 C.F.R. part 210. UCC section 4A-207 has been enacted without significant variation in California as California Uniform Commercial Code section 11207.

[4] The Fedwire system is the funds transfer system owned and operated by the Federal Reserve Bank used for the transmission and settlement of payment orders governed by Regulation J. (12 C.F.R. § 210.26(e).)

[5] Racketeer Influenced and Corrupt Organizations Act, 18 United States Code section 1961 et seq.

[6] The named claims are those that are the subject of this appeal.

transfer and in not freezing various accounts prior to the withdrawal of the monies from those accounts. In the unpublished portion of the opinion, we hold, without reaching any preemption issue, that substantial evidence supports the trial court's findings that respondents were not liable for civil conspiracy, civil RICO violations, or unfair business practices; that respondents were not liable as alter egos of one another; and that the trial court did not abuse its discretion concerning the enforcement of the March 6, 2001 discovery order. We therefore affirm the judgment.

## BACKGROUND[7]

Appellants were the victims of a fraudulent investment scheme in which $1 million they sent by wire transfer ended up with Vieri Gaines Guadagni (Gaines). Appellants made the wire transfer through their bank, Pacific Business Bank, to an account Gaines maintained at Norwest Bank. Gaines was also a signatory to several other Norwest Bank accounts owned by an entity called Western Distributing Company. Although appellants believed the account specified in their wire transfer was a trust account for the benefit of appellant James McDaniel and designated in the wire transfer "Vieri Gaines Guadagni, Trustee fbo McDaniel" as the named beneficiary, the account was in fact the joint personal checking account of Gaines and his wife, Janet Guadagni.[8] Gaines's business associate, John Sposato, as part of the fraudulent investment scheme, provided appellants with Gaines's account number and convinced appellants that Gaines would hold the wired funds as a trustee for appellants' benefit. Ultimately, the funds were all withdrawn or transferred from accounts at the Bank. Sposato subsequently pleaded guilty to criminal fraud charges in connection with the investment scheme.

At the time of the transaction at issue, Norwest Bank used an automated system for processing incoming wire transfers (wire transfer system). The wire transfer system included a database of information on account holders who regularly used wire transfers (wire transfer database). If the beneficiary of an incoming wire transfer was in the Bank's wire transfer database, the wire transfer system would automatically process the wire transfer by identifying the account number to be credited, posting the wired funds to that account, and recording the name and address of the account holder to whom the funds were credited.

---

[7] We recite the relevant facts "in the manner most favorable to the judgment, resolving all conflicts and drawing all inferences in favor of respondent. [Citation.]" (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1475, fn. 1 [77 Cal.Rptr.2d 479]; see *Ballard v. Uribe* (1986) 41 Cal.3d 564, 578, fn. 1 [224 Cal.Rptr. 664, 715 P.2d 624].)

[8] Vieri Gaines Guadagni and Jan Guadagni signed the signature card for the account. The checks for the account show only the name of Vieri Gaines Guadagni.

If, on the other hand, an incoming wire transfer was to a beneficiary who was not a regular wire transfer customer of the Bank, a "repair" operator would have to process the wire transfer manually. The operator would enter the beneficiary's account number into a separate database of account holder information. If the beneficiary's account number reflected a valid, existing account at the Bank, the database would provide the operator with the name and address of the account owner, although it is not clear if the operator would be aware that it was a joint account or a trust account. The operator would then manually enter the name and address of the account holder into the wire transfer system for recordkeeping purposes only, and the wired funds would be credited to the account number identified in the wire.

Norwest Bank's wire transfer system would not reject an incoming wire transfer if there was a discrepancy between the designated beneficiary's name and account number, and would process the transaction so long as the account number was valid. Accordingly, the Bank's policies and procedures for processing incoming wire transfers provided that the funds be posted to the account number specified, so long as the wire transfer instructions designated a valid and existing account number. Norwest Bank recorded the wire transfer beneficiary's name and address as part of the transaction history in order to comply with Bank Secrecy Act recordkeeping requirements;[9] however, the beneficiary's name was not relevant for purposes of posting the wired funds.

Norwest Bank received appellants' wire transfer on December 23, 1996. NSI handled all of Norwest Bank's wire transfer operations. Appellants' wire transfer made through the Fedwire system, as noted above, was for deposit to an account in the name of "Vieri Gaines Guadagni, Trustee fbo McDaniel," account number 101-812-4159, which account was the personal checking account of Gaines and his wife.

Because Gaines was not a regular wire transfer customer of Norwest Bank, his account information was not in the Bank's wire transfer database. Patrick Mahoney, the NSI operator who processed appellants' wire transfer, could not recall appellants' wire transfer or the procedure he followed when he processed that specific wire transfer. He could not explain why just the name "Vieri Gaines Guadagni" was recorded without the words, "trustee fbo McDaniel" in the transaction history. He said that because the Bank's policy was to post the funds to the account number specified in the wire transfer, omitting the words "trustee fbo McDaniel" made no difference. He recalled that he was instructed during Bank training sessions to include in the processing of the wire only the name of the credit party or designated beneficiary of the wire transfer and to omit such phrases as "doing business as" and "trustee," because those words might

---

[9] The Bank Secrecy Act (12 U.S.C. § 1951 et seq.), requires financial institutions to maintain certain account holder information.

cause the wire transfer system to reject the transaction. Because appellants' wire transfer specified a valid, existing account number at Norwest Bank, the transferred funds were posted to that account. Appellants had no communication with respondents before or during the sending of the wire transfer.

On December 26, 1996, Norwest Bank received another wire transfer to Gaines's account, this time from James Sanderson in the amount of $300,000. Sanderson's wire transfer specified that the funds were to be deposited to a trust account for his benefit and, like appellants' wire transfer, designated Gaines's personal checking account number as the account to be credited. On December 31, 1996, Gaines withdrew $1,300,000 from the joint checking account he and his wife maintained at Norwest Bank and deposited the monies into his personal Merrill Lynch account.

In December 1996, the Bank issued a fraud alert, because of an unusual amount of telephone calls Bank representatives received from individuals residing outside of Colorado wishing to open accounts at the Bank. In January 1997, after appellants' wire transfer had been accepted and posted, the Bank initiated a fraud investigation of Gaines's account because of telephone calls Bank representatives received from individuals inquiring about transactions relating to that account. There is conflicting evidence as to when telephone inquiries concerning Gaines's account took place; however, there was evidence that the calls did not occur until after Gaines had withdrawn appellants' funds.

On or about January 2, 1997, Gaines, at Sposato's direction, opened an account at Norwest Bank for an entity named Allhandra. Gaines is listed in the Bank's deposit agreement as Allhandra's vice-president and as a signatory on the Allhandra account. Gaines or a business associate of his told the Bank representative who opened the Allhandra account that the account was for international arbitrage trading. On January 23, 1997, Gaines transferred either $1 million or $1,300,000 from his Merrill Lynch account to a Western Distributing account at Norwest Bank. The monies deposited into the Western Distributing account were subsequently withdrawn. In mid-March 1997, after some investigation, the Bank closed Gaines's personal account and all Western Distributing accounts.

Appellants commenced actions against respondents, claiming that respondents had violated Regulation J, and that respondents were liable, inter alia, for negligence, civil conspiracy, civil RICO violations, and unfair business practices. Appellants thereafter served on respondents numerous written discovery requests, including form and special interrogatories, requests for admission, and requests for production of documents. Respondents served responses and objections to the discovery requests on July 21, September 6,

September 25, and October 2, 2000. On February 7, 2001, appellants filed a motion to compel further discovery responses and the production of documents. On March 6, 2001, the trial court issued a minute order granting appellants' motion to compel and requiring respondents to "serve verified, full and complete responses, without objections" to the discovery requests specified in appellants' statement of questions and responses in dispute submitted as part of the motion to compel further discovery responses.[10]

At trial, appellants argued that respondents had not complied with the March 6, 2001 discovery order. Appellants further contended that the March 6, 2001 order required respondents to produce all responsive documents without regard to the attorney-client privilege. The trial court disagreed with appellants' contention that the March 6, 2001 order required the production of privileged documents. Pursuant to stipulations with appellants, respondents provided a supplemental declaration stating that all responsive documents either had been produced or entered on a privilege log submitted concurrently with the supplemental declaration, and respondents produced two documents for an in camera review by the trial court, with a joint request by the parties that the trial court rule as to whether or not the documents were subject to the attorney-client privilege. The trial court ruled that one of the documents was privileged and the other was not and ordered respondents to produce the nonprivileged document. Respondents did so. The trial court did not order the production of any of the other documents listed on respondents' privilege log.

Following the trial, the trial court entered a judgment in favor of respondents. In support of that judgment, the trial court issued a statement of decision[11] containing the following findings: respondents did not violate Regulation J, UCC section 4A-207, or California Uniform Commercial Code section 11207; respondents had no knowledge, within the meaning of Regulation J, UCC section 4A-207, or California Uniform Commercial Code section 11207, of the discrepancy between the trust account specified in appellants' wire transfer and the owners of the account, Vieri Gaines Guadagni and Janet Guadagni; respondents owed no duty of care to appellants; respondents were not alter egos of one another; respondents were not negligent with respect to appellants; respondents made no misrepresentations of any type to appellants; and there was no evidence of fraud, negligent misrepresentation, civil conspiracy, civil RICO violations, unfair business practices, negligence, gross negligence, conversion, or unjust enrichment against respondents. Appellants filed this appeal.

---

[10] The March 6, 2001 minute order was not initially included in the record on appeal. We granted appellants' leave to file a late motion to augment the record to include the March 6, 2001 minute order and granted the motion to augment the record.

[11] The record on appeal did not include the trial court's October 23, 2002 statement of decision. On our own motion, we augmented the record to include it. (Cal. Rules of Court, rule 12(a).)

## DISCUSSION

### A. *Standard of Review*

■ We review the trial court's factual findings under the substantial evidence standard. (*Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 834 [118 Cal.Rptr.2d 725, 44 P.3d 102].) Under this standard, "the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence in the record, contradicted or uncontradicted, that will support the finding." (*Associated Builders and Contractors, Inc. v. San Francisco Airports Commission* (1999) 21 Cal.4th 352, 374 [87 Cal.Rptr.2d 654, 981 P.2d 499].) Moreover, when the trial court's findings are set forth in a statement of decision, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358 [236 Cal.Rptr. 543]; see *Primm v. Primm* (1956) 46 Cal.2d 690, 694 [299 P.2d 231].) ■ We review any legal issues de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].) We discuss *post* the standard of review applicable to the trial court's enforcement of the March 6, 2001 discovery order.

### B. *Regulation J*

■ Regulation J governs the transfer of funds through the Fedwire system and applies to the transaction at issue in this case. (12 C.F.R. § 210.25(a).)[12] Regulation J specifically incorporates article 4A of the UCC (12 C.F.R. § 210.25(b)(1)). The relevant portions of section 4A-207 of UCC article 4A, provide: "(a) Subject to subsection (b), if, in a payment order received by the beneficiary's bank, the name, bank account number, or other identification of the beneficiary refers to a nonexistent or unidentifiable person or account, no person has rights as a beneficiary of the order and acceptance of the order cannot occur. [¶] (b) If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply: [¶] (1) Except as otherwise provided in subsection (c),[13] if the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the number as the

---

[12] The commentary to Regulation J notes that the applicable provisions preempt inconsistent provisions of state law. (12 C.F.R. appen. A to pt. 210B.) Here, state law is not only consistent with Regulation J, it is virtually identical to Regulation J. Because the parties refer only to Regulation J, we also do so.

[13] Subsection (c) of UCC 4A-207 governs the obligation, as between the originating party and the originating party's bank, to pay an order accepted by the beneficiary's bank under section 4A-207, subsection (b)(1).

proper identification of the beneficiary of the order. The beneficiary's bank need not determine whether the name and number refer to the same person. [¶] (2) If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer. If no person has rights as beneficiary, acceptance of the order cannot occur."[14] (2B West's U. Laws Ann. (2002) U. Com. Code, foll. § 4A-207, pp. 55–56; 12 C.F.R. pt. 210B, appen. B.)

■ Appellants argue that subsection (a) of UCC section 4A-207 applies because their wire transfer identified "Vieri Gaines Guadagni as Trustee FBO McDaniel," and no such trust account existed. They maintain that Norwest Bank should not have accepted the wire transfer because subsection (a) of UCC section 4A-207 prohibits a bank from accepting a wire transfer that refers to a nonexistent person or account. Subsection (a) of UCC section 4A-207 is expressly subject, however, to subsection (b), which governs payment orders that identify the beneficiary "both by name and by an identifying account number," but a discrepancy exists between the name and account number. (2B West's U. Laws Ann., *supra*, U. Com. Code, foll. § 4A-207, at pp. 55–56.) The wire transfer at issue here designated the beneficiary both by name and by an identifiable account number, and such a discrepancy existed. UCC 4A-207, subsection (b) therefore applies.

■ UCC 4A-207, subsection (b) provides, in effect, immunity from responsibility—a "safe harbor"—for a beneficiary's bank that relies on the account number specified in a wire transfer order to identify the beneficiary of the order. (See 6A Hawkland & Lawrence, Uniform Commercial Code Series (1999) Funds Transfers, § 4A-207:2, p. Art. 4A-127; 2 Clark & Clark, Law of Bank Deposits, Collections and Credit Cards (rev. ed. 2000) Wire Transfers, § 17.03[3], pp. 17-38 to17-44.7 (Clark).) The safe harbor provision applies so long as the bank does not know that the beneficiary's name and account number refer to different persons. "Know" means to have actual knowledge. (2B West's U. Laws Ann., *supra*, U. Comm. Code, foll. § 4A-207, at pp. 55–56),[15] and the beneficiary's bank has no duty to determine whether the name and account number specified in the wire transfer refer to the same

---

[14] The commentary to Regulation J also states: "Section 4A-207 provides that a beneficiary's bank, such as a Federal Reserve Bank, may rely on the number identifying a beneficiary such as the beneficiary's account number, specified in a payment order as identifying the appropriate beneficiary, even if the payment order identifies another beneficiary by name, provided that the beneficiary's bank does not know of the inconsistency." (12 C.F.R. pt. 210, subpart B, appen. A; see 12 C.F.R. § 210.27(b).)

[15] UCC section 1-202, subsection (b) (formerly UCC section 1-201(25)(c)) defines "knowledge" as actual knowledge; see California Uniform Commercial section 1201, subdivision 25(c).

person. (2B West's U. Laws Ann., *supra*, U. Com. Code, foll. § 4A-207, at pp. 55–56; *First Security Bank of New Mexico, N.A. v. Pan American Bank* (10th Cir. 2000) 215 F.3d 1147, 1152–1153.)

The official comment to UCC section 4A-207 explains the reasoning behind the safe harbor provision: "A very large percentage of payment orders issued to the beneficiary's bank by another bank are processed by automated means using machines capable of reading orders on standard formats that identify the beneficiary by an identifying number or the number of a bank account. The processing of the order by the beneficiary's bank and the crediting of the beneficiary's account are done by use of the identifying or bank account number without human reading of the payment order itself. The process is comparable to that used in automated payment of checks. The standard format, however, may also allow the inclusion of the name of the beneficiary and other information which can be useful to the beneficiary's bank and the beneficiary but which plays no part in the process of payment. If the beneficiary's bank has both the account number and the name of the beneficiary supplied by the originator of the funds transfer, it is possible for the beneficiary's bank to determine whether the name and number refer to the same person, but if a duty to make that determination is imposed on the beneficiary's bank the benefits of automated payment are lost. . . ." (2B West's U. Laws Ann., *supra*, U. Com. Code, com. 2 to § 4A-207; Off. Com. reprinted at 23D West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 11207, pp. 58–60.)

One authority has written, "There can be arguments about when a bank 'knows' that the name and number refer to different persons, but those too should be minimal. Since 'to know' is to have actual knowledge, not notice, and since it is implausible that a bank would 'knowingly' make a large payment into a thief's account, this seems a small escape. Nevertheless, we would imagine that such cases could arise, particularly where a lucky thief does multiple transactions." (3 White & Summers, Uniform Commercial Code (4th ed. 1995) § 24-6, p. 85.)

 Appellants contend that the provisions of UCC section 4A-207, subsection (b) do not apply in this case because the Bank processed their wire transfer manually rather than by an exclusively automated means. The official comment to UCC section 4A-207 makes clear, however, that the safe harbor provisions accorded to banks apply to manual wire transfer processing as well: "Although the clear trend is for beneficiary's banks to process payment orders by automated means, Section 4A-207 is not limited to cases in which processing is done by automated means. A bank that processes by semi-automated means or even manually may rely on a number as stated in Section 4A-207." (2B West's U. Laws Ann., *supra,* U. Comm. Code, com. 2 to § 4A-207.)

On December 23, 1996, appellants wire transferred $1 million to Norwest Bank for deposit to an account in the name of "Vieri Gaines Guadagni, Trustee fbo McDaniel, account number 101-812-4159." The evidence at trial showed that Norwest Bank and NSI relied on the account number specified in appellants' wire transfer and posted the transferred funds to that account. The Bank's policies and procedures in effect at that time for processing incoming wire transfers provided that funds be posted to the account number specified in the wire transfer, so long as that account was a valid and existing account at the Bank. The account number specified in appellants' wire transfer was a valid, existing account at Norwest Bank, and the transferred funds were posted to that account.

■ There was not sufficient evidence that Norwest Bank or NSI had actual knowledge that the holder of the account number specified in appellants' wire transfer and the name specified in appellants' wire transfer were different persons. Appellants argue that the signature cards Norwest Bank maintained for Gaines's personal checking account gave the Bank constructive knowledge that the Gaines checking account was different from the trust account specified in appellants' wire transfer instructions. Constructive knowledge, however, is insufficient to establish a violation of Regulation J. (2B West's U. Laws Ann., *supra*, U. Com. Code, com. 2 to § 4A-207.)

Appellants' contention that NSI repair operator Patrick Mahoney had actual knowledge that the beneficiary "Vieri Gaines Guadagni, trustee fbo McDaniel" identified in appellants' wire transfer was different than the name listed in the Bank's account database as the owner of the account number specified in the wire transfer is unsupported by the evidence. Also unsupported is appellants' claim that Mahoney had actual knowledge of the discrepancy because he purposely altered the name of the beneficiary by deleting the words "trustee fbo McDaniel" when processing appellants' wire transfer. Mahoney testified that he could not recall appellants' wire transfer, whether he manually entered the name of the beneficiary when processing that wire transfer, or from where the information concerning the identity of the beneficiary might have come. Moreover, he testified that his practice would have been to delete words such as "trustee" and "doing business as" included in wire transfer instructions, only because those designations might cause the Bank's wire transfer system to reject the transaction and because only the account number was needed to complete the transaction.

■ Even assuming that Mr. Mahoney was aware of a difference between the names "Vieri Gaines Guadagni" and "Jan Guadagni" and "Vieri Gaines Guadagni, trustee fbo McDaniel," such awareness did not constitute actual knowledge that the "name and number identify different persons." (2B West's U. Laws Ann., *supra*, U. Com. Code, foll. § 4A-207, pp. 55–56.) One

authority has noted: "Any time a bank's wire transfer system includes any review of the name on an account, the bank's wire operator is almost certain to have actual knowledge that there is some type of mismatch or discrepancy between the name of the beneficiary identified in the wire and the name of the owner of the account designated in the wire. That does not mean, however, that the employee has actual knowledge that the name and the number refer to different people. It will be a rare case when the wire operator even knows who the named beneficiary and the owner of the designated account are. As a result, the bank should not be exposed to potential liability for accepting a wire unless there is a complete disconnect between the names. Any other result would objectify the standard contained in UCC § 4A-207(b) and would throw the wire transfer system into turmoil." (Clark, *supra*, § 17.03[3] at p. 17-44.2.) A "complete disconnect" is when the designated name and account name bear no resemblance to each other and have nothing in common with each other.

According to Clark, the principle that a bank does not have actual knowledge that a beneficiary designated in the wire transfer and the owner of the account designated in the banks' records refer to different persons unless there is at least some commonality in the names, "is consistent with the purpose of UCC section 4-207(b), which provision was a response to a few pre-Article 4A cases dealing with name or number discrepancies that are cited in Official Comment 2 to the section." (Clark, *supra*, § 17.03[3], pp. 17-44 to 17-44.1.) In those cases, *Bradford Trust Co. v. Texas American Bank-Houston* (5th Cir. 1986) 790 F.2d 407 [wire was to "a/o Frank S. Rochefort, Jr." while designated account was in the name of "Colonial Coins, Inc."]; *Securities Fund Services, Inc. v. American Nat'l Bank and Trust Co. of Chicago* (N.D.Ill. 1982) 542 F.Supp. 323 [wire was to "John Bushman, Trustee," while designated account was in the name of "Gerald S. Haberkorn, Inc."], the designated name and account name bore no resemblance to each other. According to Clark, "UCC § 4A-207(b) was adopted to require actual knowledge of a true conflict between the name and number on the wire similar to the type of complete disconnect illustrated by these pre-Article 4A cases." (Clark, *supra*, § 17.03[3], p. 17-44.1; see also 3 White & Summers, Uniform Commercial Code, *supra*, § 24-6, pp. 85–87; and ABA, Business Law Section, Working Group on Electronic Financial Services, Subcommittee on Electronic Commercial Practices, Uniform Commercial Code Committee, Model Funds Transfer Services Agreement and Commentary (1994) p. 34.)

Here, the name specified in appellants' wire transfer, "Vieri Gaines Guadagni, trustee fbo McDaniel," was sufficiently similar to "Vieri Gaines Guadagni," the name associated with the account number designated in the wire transfer, to preclude a finding of a "complete disconnect" between the two names. Substantial evidence supports the finding that respondents did not

have actual knowledge that the holder of the account number specified in appellants' wire transfer and the name designated in the wire transfer were different persons, and therefore supports the trial court's determination that respondents did not violate Regulation J or, to the extent applicable, California Uniform Commercial Code section 11207.

## C. *Negligence, Civil Conspiracy, Civil RICO, and Unfair Business Practices*

Appellants contend the trial court erred in finding that respondents were not liable for negligence, civil conspiracy, civil RICO violations, and unfair business practices. As we discuss, there was no error in the trial court's factual findings or legal conclusions. Respondent contends that Regulation J preempts state law claims in cases involving wire transfer of funds. (See *Donmar Enterprises, Inc. v. Southern Nat. Bank of North Carolina* (W.D.N.C. 1993) 828 F.Supp. 1230.) Because we hold that substantial evidence supports the trial court's decision that appellants did not prevail under their state law claims, we do not reach the preemption issue.

### (1) *Negligence*

Appellants contend that respondents were negligent because Norwest Bank did not have a wire transfer policy in effect consistent with Regulation J. Appellants argue that they became customers of Norwest Bank under California Uniform Commercial Code section 4104, subdivision (a)(5)[16] and section 11105, subdivision (a)(3)[17] when the Bank accepted their wire transfer, and that as customers, they were owed a duty of care. Appellants assert that respondents breached the duty of care by not preventing Gaines from withdrawing the funds in his account when the Bank had notice of possible fraudulent activity associated with that account. The trial court here found that respondents were not negligent, and that finding is supported by the record. (*Brewer v. Simpson* (1960) 53 Cal.2d 567, 583 [2 Cal.Rptr. 609, 349 P.2d 289]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 349, p. 395.) We discuss the evidence in support of the trial court's finding that there was no negligence. Because we hold that there is substantial evidence supporting that finding, we do not address the issue of whether or to what extent respondents owed appellants any duty.

---

[16] California Uniform Commercial Code section 4104, subdivision (a)(5) defines "customer" as "a person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank."

[17] California Uniform Commercial Code section 11105, subdivision (a)(3) defines "customer" as "a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders."

### a. *Wire Transfer Policy*

The evidence showed that Norwest Bank's wire transfer policy in effect at the time of appellants' wire transfer was consistent with Regulation J. The wire transfer production manager for Norwest Bank testified at trial concerning Norwest Bank's wire transfer policies and procedures in effect in 1996. Those policies and procedures provided that when an incoming wire transfer specified a valid account number, the Bank would post the transferred funds to the specified account number even if the wire transfer identified a beneficiary other than the holder of the account bearing the specified number. These procedures are consistent with Regulation J and California law that allow a bank to rely on the account number specified in a wire transfer order as the proper identification for the beneficiary of the order. (2B West's U. Laws Ann., *supra,* U. Com. Code, foll. § 4A-207, pp. 55–56; Cal. U. Com. Code, § 11207, subd. (b).)

Appellants argue that the Bank's wire transfer policy did not comply with Regulation J because that policy provided that funds be posted to the account number specified in an incoming wire transfer regardless of the operator's knowledge of any discrepancy between the name and account number specified in an incoming wire transfer. They note that the safe harbor provisions of UCC section 4A-207, subsection (b) do not apply unless the Bank had no actual knowledge of any discrepancy between the name and account number specified in appellants' wire transfer. Appellants contend that in order for the Bank to claim that it had no actual knowledge of any such discrepancy, the Bank was required to maintain "reasonable routines" for exercising due diligence in its wire transfer operations, as specified in California Uniform Commercial Code section 1201, subdivision (27) and UCC section 1-202, subsection (f) (formerly UCC section 1-201(27)).

■■■ UCC section 1-202, subsection (f) and California Uniform Commercial Code section 1201, subdivision (27) address notice, knowledge and notification by an organization and provide: "Notice, knowledge, or a notice or notification received by an organization is effective for a particular transaction from the time it is brought to the attention of the individual conducting that transaction and, in any event, from the time it would have been brought to the individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless the communication is part of the individual's regular duties or that individual has reason to know of the transaction and that transaction would be materially affected by the information." (1 West's

U. Laws Ann. (2004 supp.) U. Com. Code, p. 15.) This provision does not override Regulation J and specifically UCC section 4A-207, incorporated in Regulation J, so as to require a bank to maintain procedures for exercising due diligence in determining whether the holder of the account number specified in an incoming wire transfer and the name designated in the wire transfer refer to the same person. UCC section 4A-207, subsection (b), expressly provides that "the beneficiary's bank need not determine whether the name and number refer to the same person." (4A West's U. Laws Ann., *supra*, U. Com. Code, p. 55.)

As one authority has noted: "Under 4A-207(b)(1) an ignorant beneficiary's bank may rely on the number and may process the payment order mechanically or electronically without requiring that a person look at the verbal indication of the beneficiary's name. It need not even 'determine whether the name and number refer to the same person.' This conclusion is consistent with the idea that typical funds transfers should be speedy, inexpensive and not labor intensive. If it is not true already, soon the entire transaction—after it has been mechanically entered into the system—will be completed without the intervention of human eyes or hands. Presumably, therefore, machines will be instructed to read the numbers and to credit the amount represented by the numbers in the numbered account in complete obliviousness to the name on the account. By producing a relatively certain law and stating clearly who bears any loss, the drafters have done all that could be asked of them. . . . [¶] For originators and other senders the message embodied in 4A-207(b), and in the others sections of Part 2 of Article 4A, is that they should take steps to see that the numbers on their messages are the correct numbers. They should take no satisfaction in the fact that the proper names appear on the messages." (3 White & Summers, Uniform Commercial Code, *supra*, § 24-6, p. 85.)

Accordingly, Norwest Bank was not required to include in its wire transfer policy due diligence procedures for verifying the identity of a wire transfer beneficiary. We need not determine whether the Bank's wire transfer policy should also have specified procedures to be followed when a wire transfer operator has actual knowledge of a discrepancy between the name and number specified in an incoming wire transfer because there was substantial evidence supporting the trial court's finding that neither the repair operator who processed appellants' wire transfer in this case nor anyone else at Norwest Bank had actual knowledge of any such discrepancy. Thus, substantial evidence supports the finding that Norwest Bank was not negligent in posting the wired funds to the Gaines account.

### b. *Preventing Withdrawals from Accounts*

Appellants contend that the telephone inquiries the Bank received from persons inquiring about the Gaines account were an indication of fraudulent activity and triggered a duty to monitor and then freeze that account. There was evidence, however, that the calls concerning the Gaines account did not occur until after appellants' money had already been withdrawn, and we must resolve any factual conflicts in respondents' favor. (*Aceves v. Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619], overruled on another ground by *Privette v. Superior Court* (1993) 5 Cal.4th 689, 702, fn. 4 [21 Cal.Rptr.2d 72, 854 P.2d 721].) Monitoring or freezing the account would therefore not have prevented appellants' loss. The circumstances giving rise to any alleged duty did not occur until after appellants' funds had been withdrawn. (See *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.* (1996) 49 Cal.App.4th 472, 478 [56 Cal.Rptr.2d 756].)

 During oral argument, appellants claimed for the first time on appeal that respondents were negligent in not monitoring or freezing other accounts at Norwest Bank on which Gaines was a signatory, such as the Western Distributing Company accounts. They argued that the $1 million Gaines transferred in mid-January 1997 from his Merrill Lynch account to the Western Distributing Company account at Norwest Bank was the same $1 million appellants had wired into Gaines's personal checking account and that the Bank could have prevented the loss of those funds by freezing all of the Western Distributing accounts. Appellants did not make this argument in their opening brief, in which they limited the discussion concerning respondents' alleged negligence to the Gaines account, and the argument accordingly is abandoned or forfeited. (*Tiernan v. Trustees of Cal. State Universities & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317]; *Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 9, fn 1 [130 Cal.Rptr.2d 263]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457] [scope of appellate review is limited to issues adequately raised and supported in appellant's brief].)

Even if we were to reach the issue, substantial evidence supports the trial court's finding of no negligence. There was evidence that the Bank did not receive telephone inquiries specifically concerning the Gaines account until mid-January, and there was no evidence that the Bank received any inquiries or complaints concerning the Western Distributing accounts. There is insufficient evidence that prior to the withdrawal of the monies from either the Gaines or Western Distributing accounts, the Bank knew or should have known that the funds in those accounts were there as a result of fraud. Accordingly, the evidence does not establish that the bank was negligent in not freezing the Gaines or Western Distributing accounts before appellants' funds were disbursed.

C.(2)–E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

Turner, P. J., and Grignon, J., concurred.

A petition for a rehearing was denied January 3, 2005, and appellants' petition for review by the Supreme Court was denied March 30, 2005. Baxter, J., and Chin, J., did not participate therein.

---

*See footnote, *ante*, page 1021.