**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 28 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LEO G. WETHERILL, II, CHRISTOPHER
WETHERILL, PATRICIA WETHERILL
BAUMGARTNER, LEIGH WETHERILL
BOGARDUS, PHILLIP JOHN
BOGARDUS and KATHERINE
BOGARDUS,

       Plaintiffs-Appellants,

v.

BANK IV KANSAS, N.A.,

       Defendant-Appellee.

No. 97-3073

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 96-2159-GTV)**

---

Dan C. Sanders of Gepford, Monaco & Sanders, L.C., Kansas City, Missouri, for
Plaintiffs-Appellants.

James J. Roddy (Bruce E. Baty with him on the brief), of Morrison & Hecker, L.L.P.,
Kansas City, Missouri, for Defendant-Appellee.

---

Before **PORFILIO** and **EBEL**, Circuit Judges, and **BRETT**, District Judge.[*]

---

[*]   Honorable Thomas R. Brett, Senior District Judge, United States District Court
for the Northern District of Oklahoma, sitting by designation.

**BRETT**, Senior United States District Judge.

Beneficiaries of six inter vivos trusts ("beneficiaries"), appeal an order of the United States District Court for the District of Kansas granting summary judgment to Bank IV Kansas ("Bank IV"), on beneficiaries' action to recover monies (and lost income) wrongfully converted from their bank trust fund accounts by the trustee, Gary Leitner. Beneficiaries sought to hold Bank IV liable for their losses based on theories of negligence, conversion, breach of fiduciary duties and commercially unreasonable conduct and bad faith. The district court found the beneficiaries failed to establish a prima facie case against Bank IV. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm.

## I. Background

On February 15, 1985, Leo Wetherill ("Wetherill") established four irrevocable trusts, one for each of his four adult children. Attorney Thomas C. Brown ("Brown") was retained to create the trust instruments and was also appointed trustee. Brown served in this position from the inception of the trusts until his resignation, at Wetherill's request, on September 4, 1987, effective November 4, 1987. At that time, attorney Gary Leitner ("Leitner") was named successor trustee for the four trusts. Leitner had become a trusted advisor to Wetherill while serving as corporate secretary and providing corporate accounting services to

Wetherill's corporation, LGW Resources, Inc., ("LGW") for several years prior to his appointment as trustee.[1]

Following Leitner's appointment, two additional irrevocable trusts were established in 1988 and 1990, shortly after the births of Wetherill's grandson and granddaughter, respectively, naming the newly-born grandchildren as beneficiaries. Leitner was named trustee of these two trusts as well. The terms and conditions of all six trusts, for purposes of this litigation, are essentially the same.

The six trust instruments authorized Leitner "in [his] fiduciary capacity, to exercise all powers in the management of the trust fund which any individual could exercise in his own right, upon such terms and conditions as [he] may deem best." In January of 1989, acting pursuant to his authority under the trusts, Leitner opened five money market accounts at Bank IV, one for each of the then existing trust beneficiaries. A sixth money market account was opened with Bank IV in 1990.[2] In keeping with Bank IV policy requiring individuals seeking to open bank accounts as trustee of a trust to provide a copy of the trust instrument, Leitner provided a copy of each of the irrevocable trust agreements, which indicated his authority to open and maintain such accounts.

---

[1]     Wetherill was the sole owner of LGW, which owned a percentage working interest in two Kansas oil properties. LGW generated much of the income which eventually funded the trusts.

[2]     The trusts had originally been funded by contributions of stock.

Leitner requested that the accounts be maintained in his name, as trustee, and that all monthly bank statements be sent to his personal residence in Kansas. Bank IV complied with these requests. Leitner was the sole signatory on all of the accounts and had authority to sign checks, withdraw funds, and approve telephone transfers of funds. Bank IV acted only as the depository of the trust funds and did not act in any official fiduciary capacity regarding the trusts. Wetherill was aware of and acquiesced in these arrangements.

Wetherill established each of the six trusts for his children and grandchildren as part of his overall estate planning. Wetherill anticipated and intended that his children and grandchildren would not begin drawing on the trusts' principal and income until after his death. Accordingly, Wetherill neither provided copies of the trust agreements or bank statements nor discussed the trust assets or the specific terms of the trusts with the beneficiaries. Wetherill had placed restrictions in the trust agreements limiting withdrawals by the beneficiaries to an amount equal to or less than a year's contribution to the trusts.

The beneficiaries' knowledge of the trusts was generally limited to the fact that attorney Brown had set up the trusts for them on behalf of Wetherill as part of his estate planning, and that, in 1987, Wetherill appointed Leitner as successor trustee. The beneficiaries were unaware of the terms of the trusts, the nature and extent of the trust assets, and the conditions under which they were entitled to receive trust funds. The beneficiaries did not meet with either Brown or Leitner concerning the trusts.

On at least four occasions between 1986 and August 1992, Leigh Wetherill Bogardus ("Bogardus") inquired of Wetherill concerning the parameters of the three trusts of which she and her two children were beneficiaries and what contributions were being made to them. In response to her inquiries, Wetherill stated he would instruct Leitner to provide her with an accounting of each of the three trusts, as well as copies of those trust documents. She was given various excuses why Leitner had not had time to provide the requested information but never received an accounting nor any of the documents.

Leitner did discuss the status of the trust accounts with Wetherill several times a year beginning in 1988, always representing he was receiving a very favorable rate of return. In 1992, Leitner advised Wetherill that the funds had been invested in certificates of deposit earning ten percent (10%) interest. Leitner further convinced Wetherill that it would be unwise to send account statements to any of the beneficiaries. Neither Wetherill nor the beneficiaries contacted Bank IV concerning the trust accounts.

Wetherill made annual contributions in the amount of $10,000 to each of the six trusts by delivering personal checks to Leitner payable either to the individual trusts or to Leitner as trustee. Leitner would deposit the checks in the appropriate trust accounts. During an approximate three-year period, from on or about January 17, 1989, through March 31, 1992 (the last day of account activity), deposits made into the trust accounts were often followed within a matter of days by substantial withdrawals by Leitner. The withdrawn funds were deposited into Leitner's personal and/or business accounts at Bank IV through telephonic

transfers or checks written to himself.  Checks were also written to third parties for Leitner's benefit.  Leitner's withdrawals virtually depleted each trust account to near zero balances.  The amount misappropriated by Leitner in these transactions totalled $253,787.48.  None of these transactions, which were designed solely to enrich Leitner, were authorized by the trust agreements, which provided for: (1) quarterly distributions of trust income to each beneficiary; (2) notice to be given to each beneficiary of each annual contribution, with the right to withdraw said contribution; and (3) annual reports of the trust funds to be given to each beneficiary.  The trust agreements also stated that the trustee's records could be examined at all reasonable times by Wetherill, the beneficiaries, or beneficiaries' guardians.

On or about November 18, 1992, following discovery of irregularities in the financial and business transactions of his company, LGW, Wetherill requested that Leitner provide him with all bank statements, canceled checks, and account records for LGW and for the six trust accounts maintained at Bank IV.[3]  Leitner refused to turn over the documents.  On November 20, 1992, Wetherill notified Bank IV of possible problems with the trust accounts by filing suit against the bank to freeze the six accounts as well as all LGW accounts.  Leitner resigned  as trustee of the six trust accounts on November 24, 1992.[4]

_____

[3]     Leitner misappropriated more than $600,000 over the applicable time frame from LGW, which was discovered when a production supervisor contacted Wetherill directly to advise him of a bounced check.  Wetherill's follow-up revealed Leitner's malfeasance as to business and trust accounts.

[4]     In October, 1993, Leitner pleaded guilty to embezzlement by bank fraud.

Kenneth Chick ("Chick"), a Bank IV vice-president, often saw Leitner in the bank conducting business for himself, his various construction enterprises and LGW, and would occasionally talk to him. Through the bank's computer system, Chick had access to all of Leitner's bank account transactions. Chick knew that Leitner had been experiencing financial problems and faced default on several personal and business loans Leitner had outstanding with Bank IV. However, at no time did Chick discuss with Leitner the opening or maintaining of the Bank IV bank accounts into which the subject trust funds were deposited. Chick was not aware the six trust accounts even existed. During oral argument beneficiaries' counsel conceded the record revealed no evidence of actual knowledge on the part of Bank IV of the subject misappropriations by Leitner.

Beneficiaries brought this action against Bank IV on November 17, 1994. The district court granted Bank IV summary judgment on the ground that the Uniform Trustees' Powers Act, Kan. Stat. Ann. § 58-1207 (1994)("Act"), was a bar to beneficiaries' causes of action because the record established no evidence that Bank IV had actual knowledge of Leitner's misappropriations of the trust funds.

## II.  Standard of Review

We review the district court's grant of summary judgment de novo, applying the same standard employed by the district court. Bohn v. Park City Group, Inc., 94 F.3d 1457, 1460 (10th Cir. 1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Williams v. Widnall, 79 F. 3d 1003, 1005 (10th Cir. 1996). The moving party has the initial burden of showing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing a properly supported motion for summary judgment must offer evidence, in admissible form, of specific facts sufficient to raise a genuine issue for trial as to the elements of the non-moving party's case. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Thus, to defeat a summary judgment motion, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586.

In applying this standard, we must "examine the factual record and reasonable inferences therefrom in the light most favorable to the non-moving/opposing party." Kidd v. Taos Ski Valley, Inc., 88 F.3d 848, 851 (10th Cir. 1996). If no dispute exists concerning a genuine issue of material fact, we then determine whether the district court correctly applied the substantive law. Peck v. Horrocks Engineers, Inc., 106 F.3d 949, 951 (10th Cir. 1997).

### III. Analysis

Wetherill vested Leitner with virtually unlimited authority in the trust agreements to make deposits and withdrawals from the trust accounts at will, as Leitner chose within his

discretion. This Court must determine whether beneficiaries can look to Bank IV to recover their losses. We hold they cannot where the bank had no actual knowledge of Leitner's actions as that term is defined under § 58-1207.[5] The Act states:

> "With respect to third persons . . . dealing with a trustee or assisting a trustee in the conduct of a transaction, the existence of trust powers and their exercise by the trustee may be assumed without inquiry. Third persons are not bound to inquire whether the trustee has power to act or is properly exercising the power; and third persons, without <u>actual knowledge</u> that the trustee is exceeding his or her powers or improperly exercising them, are fully protected in dealing with the trustee as if the trustee possessed and properly exercised the powers he or she purports to exercise. Third persons are not bound to assure the proper application of trust assets paid or delivered to the trustee."(emphasis added)

In granting summary judgment to Bank IV, the district court rejected beneficiaries' assertion that the term "actual knowledge" should be broadened to encompass "constructive knowledge" under the circumstances of this case. Beneficiaries assert that anyone who reviewed Leitner's transactions would have concluded that he was misappropriating trust account funds. Beneficiaries' position would impose on third parties dealing with a trustee a duty of vigilance beyond that required of settlors and/or beneficiaries themselves. The fact that it would have been easier for the bank to discover the misappropriations because it had access to all of Leitner's financial transactions through the bank's computer system does not

---

[5]    Because this issue is dispositive, the Court need not  address the other defenses raised by Bank IV regarding statute of limitations, Kan. Stat. Ann. § 60-513 (1994), laches, and the Kansas Uniform Commercial Code limitations sections, Kan. U.C.C. Ann. § 84-4-406 and § 84-3-406 (West 1996).

give rise to a duty to do so, particularly where, as here, beneficiaries concede there is no evidence of actual knowledge by the bank.

The trial court instead applied a literal definition to the term "actual knowledge," recognizing the higher evidentiary standard which was intended to be applied to such transactions. This Court concurs. The clear terms of § 58-1207 confer on Bank IV the right to presume that Leitner had both the power to perform the transactions in controversy, and that he was acting within the scope of such authority. Bank IV had no duty to inquire into Leitner's authority to conduct the transactions. Unless there was "actual knowledge" of a fiduciary breach, Bank IV enjoyed complete protection in its dealings with Leitner and had no obligation to ensure that Leitner had properly applied the trust fund monies, even where the misapplications of funds benefited the bank in having its loans to Leitner paid. While this result may at first appear harsh, to hold otherwise where the bank was unaware it was benefiting from Leitner's wrongdoing, would necessarily chill commercial transactions.

There is a dearth of Kansas authority interpreting § 58-1207. In fact, only one Kansas case, Mark Twain Kansas City Bank v. Kroh Bros. Dev. Co., 863 P.2d 355, 363 (Kan. 1992), has addressed the statute, referencing it summarily. The court found it inapplicable because the bank which sought its protection had dealt with persons other than the disclosed trustee in the disputed transactions. This is clearly distinguishable from the case at bar, in which Bank IV at all times was dealing with a duly appointed and acting trustee.

Although the Kansas court has not had occasion to define "actual knowledge" under § 58-1207, other states that have adopted provisions of the Uniform Trustees' Powers Act have expressly rejected the view that the term "actual knowledge" incorporates "constructive knowledge." See, e.g., Collier v. Trustmark National Bank, 678 So.2d 693, 697 (Miss. 1996); Adler v. Manor Healthcare Corp., 9 Cal. Rptr. 2d 732, 735 (Cal. Ct. App. 1992).

Beneficiaries' contention that Bank IV should be accountable under the broader definition is based upon the assumption that Bank IV's potential ability to review all accounts connected with Leitner through the bank's computer records creates a duty to do so. Their argument is that Bank IV employees, particularly Kenneth Chick, had access to all of Leitner's account records so that a simple investigation would have alerted Bank IV that Leitner was misappropriating trust account funds.[6] However, § 58-1207 makes it clear that absent actual knowledge Leitner was exceeding his trust powers or improperly exercising them, Bank IV had no duty to investigate Leitner's transactions. Bank IV v. Capitol Federal Sav. & Loan Ass'n, 828 P.2d 355, 357-58 (Kan. 1992) (interpreting the "actual knowledge" requirement under Uniform Durable Power of Attorney Act, Kan. Stat Ann. § 58-610 et seq., to entail no investigative duties.)

---

[6] Bank IV's Chick was aware at relevant times that Leitner personally was experiencing financial problems and was in default to Bank IV on personal and business loans. Leitner's several personal and business accounts with overdrafts at Bank IV evidenced his financial condition.

The fact that Leitner wrote numerous checks on beneficiaries' trust accounts and then deposited the funds in his own accounts at Bank IV did not, as a matter of law, place Bank IV on notice of account irregularities or improprieties. Restatement (Second) of Trusts § 324 cmt. g (1957) states:

> "[I]f a trustee draws a check upon his account as trustee payable to himself personally, the bank is not bound to make inquiry whether the trustee is committing a breach of trust thereby . . . nor is the bank bound to make such inquiry where the trustee deposits the check in the bank to the credit of his personal account with the bank."

Beneficiaries urge § 58-1207 does not provide an exclusive remedy and that they should be able to proceed on their claims under Kansas common law coupled with various Uniform Commercial Code statutes ("U.C.C.") adopted by Kansas. Beneficiaries cite to Kan. U.C.C. Ann. § 84-1-203 (West 1996), "[e]very contract or duty within this act imposes an obligation of good faith in its performance or enforcement;" Kan. U.C.C. Ann. § 84-1-102 (West 1996), "the obligation of good faith, diligence, reasonableness and care prescribed by this act may not be disclaimed by agreement . . . ."; Kan. U.C.C. Ann. § 84-4-103 (West 1996), regarding bank deposits and collections, prohibiting a bank from disclaiming responsibility "for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure;" and Kan. U.C.C. Ann. § 84-3-103(4) (West 1996) stating that good faith is "honesty in fact and the observance of reasonable commercial standards of fair dealing." Beneficiaries' common law claims are based upon the assertion

-12-

that Bank IV's negligence and breach of fiduciary duties facilitated the misappropriations by Leitner from the trust bank accounts. This Court does not agree.

The language of § 58-1207, enacted in 1968, is a specific statute addressing when third persons as a matter of law, may assume a trustee is acting according to trust powers granted. Its enactment defined the legal obligations of third persons dealing with trustees, necessarily replacing any and all prior law, statutory or otherwise. A fundamental premise of statutory construction is that a specific statute dealing with a subject controls over the general statute on the subject, unless it appears the legislature intended the general act to control. Kansas Racing Management, Inc. v. Kansas Racing Commission, 770 P.2d 423, 425 (Kan. 1989); Baumann v. Excel Indus., Inc., 845 P.2d 65, 70 (Kan. Ct. App. 1993).

Beneficiaries would be in no different position legally were the Court to determine the U.C.C. provisions were applicable. The U.C.C. affords Bank IV virtually the same protection in its dealings with trustees by also requiring "actual knowledge" of a fiduciary breach to implicate liability. See, Kan. U.C.C. Ann. §§ 84-1-201(25) and 84-3-307(b) (West 1996). Also see, Broadway National Bank v. G & L Athletic Supplies, Inc., 691 P.2d 400, 403 (Kan. Ct. App. 1984), in which the court, interpreting the term "actual knowledge" under the U.C.C., held that "reason to know" is not included within the meaning of "actual knowledge."

Beneficiaries urge Missouri rather than Kansas law should be applied in this case. This affords no relief to beneficiaries, however. See, Huber, et al., v. Magna Bank of Mo.,

et al., 1997 WL 668579 (Mo. Ct. App. 1997), in which the court applied the standard of actual knowledge in exonerating the bank under Missouri law.[7]

In conclusion, we hold the trial court was justified in finding, pursuant to Fed. R. Civ. P. 56, that beneficiaries failed to produce evidence creating an inference for the trier of fact to conclude that Bank IV had actual knowledge of Leitner's unauthorized transactions. Beneficiaries' case rests essentially on the theory Bank IV had constructive knowledge of Leitner's defalcations which, under § 58-1207, is insufficient to create an issue of fact for the jury.

The trial court's entry of summary judgment is hereby AFFIRMED.

---

[7] The instant trust agreements provide they are to be "construed and administered under the laws of the state of Missouri, unless the trustee moves the situs of the trust property to another state and then the law of that state shall govern." (Trust Agreement, Art. XII.4). Herein, we deal with the issues of the duty of a depository bank where trust funds are on deposit in a bank in the state of Kansas. Whether Kansas or Missouri law applies, the parties agree the language of § 58-1207 is essentially the same as found in Missouri's, § 456.560 Mo. Rev. Stat. (1994).