Ursula Ungaro, UNITED STATES DISTRICT JUDGE
THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment (D.E. 54).
THE COURT has considered the Motion, the pertinent portions of the record and is otherwise fully advised in the premises. For the reasons set forth below, the motion is granted.
BACKGROUND
Unless otherwise noted, these facts are undisputed.
I. The Wire Transfer
Plaintiff, Peter E. Shapiro, P.A., is a law firm whose sole principal is Mr. Peter Shapiro.[1] D.E. 53, ¶¶ 1-2. The case arises out of a $504,611.13 wire transfer that Plaintiff initiated to an account at Defendant, Wells Fargo Bank. Id. ¶ 4.
Shapiro had a client, a car dealership, that needed to repay a loan, and Shapiro facilitated that transaction. Id. ¶¶ 3-9. On November 16, 2017, the client forwarded Shapiro an email from the lender's lawyer, James Messenger, containing wire transfer instructions for repaying the loan. Id. ¶ 6. That email identified Mr. Messenger's bank as M & T Bank in Syracuse, New York. Id. ¶ 7.
The next day, the client forwarded Shapiro another email purportedly from Mr. Messenger that directed repayment to a different account: a Wells Fargo account based in Texas. Id. ¶¶ 9-10. The second email stated:
Please here are [sic] my escrow account for today [sic] payoff wire transfer instructions. Our M & T bank [sic] is currently on audit [and] as a result can't receive funds for now. Please let the wire transfer be made to this our Wells Fargo bank [sic]. Find attached our bank details.
Id. ¶ 9.
Despite receiving these two sets of wire transfer instructions, Plaintiff did not *1228 email or speak to Mr. Messenger. D.E. 53-1, 53:16-19 (Deposition of Peter Shapiro). And despite the five typographical and capitalization errors in the second email, Shapiro chose to rely on it because it was more recent. Id. 54:19-55:4.
The same day that Shapiro received the second email, he initiated the wire transfer to the Wells Fargo account. D.E. 53 ¶¶ 12-13; Ex. G. But Mr. Messenger never received the funds, because the Wells Fargo account did not belong to him. D.E. 71 ¶ 5. It belonged instead to someone named Chris Achebe, who promptly removed the funds from the account. D.E. 53 ¶¶ 17, 37. On December 14, Plaintiff's bank sent Wells Fargo a recall request, but Wells Fargo denied it because the funds were already gone. Id. ¶¶ 36.
II. Wells Fargo's Wire Transfer Procedures
Wells Fargo processes wire transfers through an electronic system called the Money Transfer System ("MTS"). D.E. 53 ¶ 19. When a wire transfer identifies a valid Wells Fargo account number, the MTS processes the transfer through an automated[2] process. Id. ¶¶ 19, 24. MTS creates an automated audit trail that documents the various automated steps in the process. Id. ¶ 20. In this case, the automated audit trail included an entry that reads, "possible name mismatch in CDT party." Id. ¶ 23. This possible name mismatch entry was not seen by anybody at Wells Fargo. Id. ¶ 26. Possible name mismatch entries are common in wire transfers. Id. ¶ 28.
The wire transfer included the partial word "ATTORN." Id. ¶ 30. This triggered Wells Fargo's Office of Foreign Asset Control ("OFAC") to review the transfer for possible United States sanctions violations because of the similarity of "ATTORN" to "ATTOUN," a name which appears on the sanctions list. Id. This review was conducted by a person, who determined that there was no match between "ATTORN" and "ATTOUN." Id. ¶ 35. The OFAC screening process does not consider whether there is a name mismatch between the intended beneficiary and the name attached to the receiving account. Id. ¶ 33.
PROCEDURAL HISTORY
Plaintiff filed the complaint on February 5, 2018, which included one claim for violating the Uniform Commercial Code's ("UCC") wire transfer statute as adopted in Florida Statutes section 670.207, and one claim for negligence. D.E. 1. The Court dismissed the negligence claim with prejudice because it was preempted by the wire transfer statute. D.E. 14. The Court allowed the statutory claim to proceed. Id.
LEGAL STANDARD
Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When determining whether the moving party has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the non-moving party."
*1229 Adickes v. S.H. Kress & Co. , 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ; Rojas v. Florida , 285 F.3d 1339, 1341-42 (11th Cir. 2002).
The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of proving that no genuine issue of material fact exists, the non-moving party must make a showing sufficient to establish the existence of an essential element of that party's case and on which that party will bear the burden of proof at trial." See Celotex Corp. v. Catrett , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ; Poole v. Country Club of Columbus, Inc. , 129 F.3d 551, 553 (11th Cir. 1997) ; Barfield v. Brierton , 883 F.2d 923, 933 (11th Cir. 1989).
If the record presents factual issues, the Court must not decide them; it must deny the motion and proceed to trial. Envntl. Def. Fund v. Marsh , 651 F.2d 983, 991 (5th Cir. 1981). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co. , 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment. Impossible Elec. Techs., Inc. v. Wackenhut Protective Sys., Inc. , 669 F.2d 1026, 1031 (5th Cir. 1982) ; see also Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").
Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. Adickes , 398 U.S. at 160, 90 S.Ct. 1598. The moving party must demonstrate that the facts underlying the relevant legal questions raised by the pleadings or are not otherwise in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. Brunswick Corp. v. Vineberg , 370 F.2d 605, 611-12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. Liberty Lobby, Inc. , 477 U.S. at 255, 106 S.Ct. 2505.
DISCUSSION
As the Court noted in its order on the motion to dismiss (D.E. 14), the viability of Plaintiff's statutory claim turns on whether Wells Fargo had actual knowledge that the recipient's name and the name on the receiving account did not match. The Court explained, "[i]f Wells Fargo did not know [of the mismatch], then it was entitled to rely on the account number, and thus did not violate the statute when it transferred the funds to Chris Achebe." D.E. 14, p. 4. Wells Fargo now moves for summary judgment on the basis that there is no evidence tending to show that Wells Fargo had actual knowledge of the mismatch.
In opposition, Plaintiff first argues that Wells Fargo knew about the mismatch because it opened the receiving account in Chris Achebe's name and the automated audit trail identified a possible name mismatch. And second, it argues that the statute imposes a due diligence requirement on Wells Fargo, which the bank failed to meet.
I. The Florida Banking Statutes
Florida has adopted the Uniform Commercial Code's ("UCC") relevant banking statutes. This case is governed by section 670.207 of the Florida Statutes. Section 670.207 (which is materially identical to *1230 UCC § 4A-207 ) entitled "Misdescription of beneficiary," provides, in relevant part:
(2) If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply:
(a) [I]f the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order. The beneficiary's bank need not determine whether the name and number refer to the same person.
(b) If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer. If no person has rights as beneficiary, acceptance of the order cannot occur.
§ 670.207(2) (emphasis added).
Knowledge means "actual knowledge" and is effective for a particular transaction:
from the time when it is brought to the attention of the individual conducting that transaction, and, in any event, from the time when it would have been brought to the individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of the individual's regular duties or the individual has reason to know of the transaction and that the transaction would be materially affected by the information.
Fla. Stat. § 671.201(27) ; see also § 671.201(25).
Some background is necessary to understand the purpose and effect of this statute. In 1987, Congress passed the Expedited Funds Availability Act ("EFAA"), and in 2003, it passed the Check Clearing for the 21st Century Act. See generally 12 U.S.C. § 4001, et seq ; 12 U.S.C. § 5001, et seq. Both acts were passed to expedite the transfer of funds through banks and to diminish the length of time that banks held funds between transfers. See generally id. Congress gave the Board of Governors of the Federal Reserve System (the "Board"), the authority to implement both acts via regulation. See 12 C.F.R. § 229.1. To that end, the Board issued Regulation CC, which among other things, requires banks to make electronically transferred funds available to the recipient within one business day. 12 C.F.R. § 229.10(b).
The Board's regulations created legal uncertainty about banks' obligations and liabilities. Judicial authority was "sparse, undeveloped, and not uniform." UCC § 4A-102. Article 4A of the UCC, therefore, was drafted to provide a "clean slate." Id. The Article's stated purpose is to create "precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability ...." Id. It specifically endorses clear bright-line rules, and rejects "broadly stated, flexible principles." Id. Moreover, it intends for Courts to rely exclusively on the carefully balanced duties and liabilities set forth in Article 4A, and to eschew any principles of law or equity outside of Article 4A when deciding cases *1231 that fall within the statute's ambit. Id. The Florida Legislature adopted all of these principles when it adopted UCC Article 4A almost verbatim. See Fla. Stat. § 670.102.
With respect to the particular provision at issue here ( section 670.207 ), the Florida Legislature has, in great detail, explained the purpose and scope of the protection it affords banks. Comment 2 to the statute reads, in relevant part:
A very large percentage of payment orders issued to the beneficiary's bank by another bank are processed by automated means using machines capable of reading orders on standard formats that identify the beneficiary by an identifying number or the number of a bank account. The processing of the order by the beneficiary's bank and the crediting of the beneficiary's account are done by use of the identifying or bank account number without human reading of the payment order itself. The process is comparable to that used in automated payment of checks. The standard format, however, may also allow the inclusion of the name of the beneficiary and other information which can be useful to the beneficiary's bank and the beneficiary but which plays no part in the process of payment . If the beneficiary's bank has both the account number and name of the beneficiary supplied by the originator of the funds transfer, it is possible for the beneficiary's bank to determine whether the name and number refer to the same person, but if a duty to make that determination is imposed on the beneficiary's bank the benefits of automated payment are lost . Manual handling of payment orders is both expensive and subject to human error. If payment orders can be handled on an automated basis there are substantial economies of operation and the possibility of clerical error is reduced. Subsection (b) allows banks to utilize automated processing by allowing banks to act on the basis of the number without regard to the name if the bank does not know that the name and number refer to different persons. "Know" is defined in Section 1-201(25) to mean actual knowledge, and Section 1-201(27) states rules for determining when an organization has knowledge of information received by the organization. The time of payment is the pertinent time at which knowledge or lack of knowledge must be determined.
Although the clear trend is for beneficiary's banks to process payment orders by automated means, Section 4A-207 is not limited to cases in which processing is done by automated means. A bank that processes by semi-automated means or even manually may rely on number as stated in Section 4A-207 .
Fla Stat. § 670.207, cmt 2. (emphasis added).
In summation, this statutory framework permits, and indeed encourages, banks to process electronic funds transfers via automated systems. Moreover, it expressly excuses banks from any duty to verify whether the recipient's name and the name on the receiving account match. See id ("[I]f a duty to make that determination is imposed on the beneficiary's bank the benefits of automated payment are lost.... Beneficiary's Bank has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary of the order."). And finally, this protection is not limited only to fully automated systems, but includes semi-automated systems as well. See id.
As discussed in more detail below, this clear protection for the beneficiary's bank undermines Plaintiff's arguments, which distilled to their essence, are an attempt to *1232 impose upon banks a duty that the statute expressly rejects.
II. Case Law Interpreting Article 4A
No court applying Florida law has squarely addressed the issue presented by this case, but numerous other states have adopted Article 4A, and courts in those jurisdictions have considered this issue. In Sliders Trading Co. L.L.C. v. Wells Fargo Bank NA , for example, the District Court for the Northern District of California confronted the same issue under an identical statute. No. 17-CV-04930-LB, 2017 WL 6539843, at *6 (N.D. Cal. Dec. 21, 2017). It held that the bank was entitled to rely on the receiving account number even when the number and name did not match. "The beneficiary's bank has no duty to determine whether the name and account number specified in the wire transfer relate to the same person." Id. (internal quotations omitted); see also Fla. Stat. § 670.207 cmt. 2 ("Beneficiary's Bank has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary of the order."). Furthermore, the court explained, "Knowledge means 'actual knowledge.' " Id. (citing TME Enterprs., Inc. v. Norwest Corp. , 124 Cal. App. 4th 1021, 1030-31, 22 Cal.Rptr.3d 146 (2004) ).
The Tenth Circuit Court of Appeals is in agreement. While interpreting the same UCC provision adopted into New Mexico's statutes, that court explained:
As noted, § 55-4A-207(b) was designed with automated wire transfer services in mind. In a fully automated system, computer software identifies the account number on an incoming wire, searches the bank's system for a matching account number, and credits the account if a match is found. Id. , Official Comment 2. The efficiency benefits of an automated system are undermined if a bank is not able to rely on its automated system but must independently verify there is no conflict between a beneficiary name and an account number. Thus, the drafters of § 55-4A-207 clarified that although it is possible for the beneficiary's bank to determine whether the name and number refer to the same person, it "has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary of the order."Id. Significantly, the statute "is not limited to cases in which processing is done by automated means. A bank that processes by semi-automated means or even manually may rely on number as stated in Section 4A-207." Id.
Although a bank has no duty to affirmatively search for conflicts between beneficiary names and account numbers of incoming wires, it may not escape liability if, before it pays the wire, it gains knowledge of the conflict by any means but nonetheless pays an individual who is not entitled to receive the funds. "Knowledge" means actual knowledge, not constructive knowledge, and is determined at the time of payment.Id.
First Sec. Bank of New Mexico, N.A. v. Pan Am. Bank , 215 F.3d 1147, 1152 (10th Cir. 2000) (emphasis added).
Additionally, the mere presence of information stored in an automated computer program does not create knowledge. In a different case, the Tenth Circuit held that "actual knowledge" should be given its "literal definition." Wetherill v. Bank IV Kansas, N.A. , 145 F.3d 1187, 1192 (10th Cir. 1998). Thus, information stored within a bank's computer system does not create actual knowledge or a duty to investigate. Id. The court recognized that "[w]hile this result may at first appear harsh, to hold otherwise where the bank was unaware it *1233 was benefiting from Leitner's wrongdoing, would necessarily chill commercial transactions." Id.
III. Application to the Present Case
Here, Wells Fargo processed the wire transfer according to an automated process. True, a person reviewed the transaction for sanctions compliance, but it is undisputed that the person did not look at whether the name and account number matched. D.E. 53 ¶ 33. At no point in the process did anyone become consciously aware that the name and account did not match. The audit report noted a possible name mismatch, but this digitally stored information did not come to anyone's attention at the time of the transfer. See Wetherill , 145 F.3d at 1192 (holding that date stored in a computer system, which if inspected would have revealed wrongdoing, was not actual knowledge). There is, therefore, no evidence that Wells Fargo had actual knowledge of the mismatch.
Plaintiff argues that Wells Fargo had knowledge because it had opened the receiving account in Chris Achebe's name and it had processed a fraudulent wire to his account previously. But these facts do not create actual knowledge of a mismatch in the wire transfer at issue. They do not even create constructive knowledge of a mismatch.
Plaintiff next argues that Wells Fargo would have had knowledge if it exercised due diligence, and due diligence required Wells Fargo to put in place systems to catch name mismatches like this one.[3] This argument fails for several reasons. First, the due diligence requirement from section 671.201(27) applies only to "the "individual conducting the transaction." See Fla. Stat. § 671.201(27). Here, no individual conducted the transaction; it was automated. And this automation is not only permitted, but encouraged and protected by Article 4A so as to remove the possibility of human error. Fla Stat. § 670.207, cmt 2.
Second, even if this due diligence standard applied here, it would not impose on Wells Fargo a duty to determine whether the name and account matched; the statute expressly relieves banks of that duty. See Fla. Stat. § 670.207 cmt. 2 ("Beneficiary's Bank has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary of the order."); Sliders , 2017 WL 6539843, at *6 ("The beneficiary's bank has no duty to determine whether the name and account number specified in the wire transfer relate to the same person."); Wetherill , 145 F.3d at 1192 (holding that even with constructive knowledge, there is no duty to investigate). Another case, TME Enterprises, Inc. v. Norwest Corp. , is instructive. 124 Cal. App. 4th 1021, 1037, 22 Cal.Rptr.3d 146, 150 (2004). The court there interpreted an identical UCC provision in a similar mismatch case and held that even where the transaction was reviewed by a person, the "due diligence" requirement did not override section 207. The bank, therefore, was not required to exercise due diligence in determining whether the name and account matched. Id. The court explained:
[M]achines will be instructed to read the numbers and to credit the amount represented by the numbers in the numbered account in complete obliviousness to the name on the account . By *1234 producing a relatively certain law and stating clearly who bears any loss, the drafters have done all that could be asked of them.
Id. (emphasis added).
And finally, Plaintiff's proposed due diligence standard would undermine the express purpose of Article 4A by reinserting human review into a process which is intended to be quick and automated. See Fla. Stat. § 670.207, cmt. 2 ("Manual handling of payment orders is both expensive and subject to human error. If payment orders can be handled on an automated basis there are substantial economies of operation and the possibility of clerical error is reduced.").
In sum, Wells Fargo is correct that there is no evidence that it had actual knowledge of a mismatch, and Plaintiff cannot impose a duty of care upon Wells Fargo that the statute expressly rejects. For these reasons, it is hereby
ORDERED AND ADJUDGED that the Motion (D.E. 54) is GRANTED. The Court will enter a separate judgment. It is further
ORDERED AND ADJUDGED that the case is CLOSED for administrative purposes. All hearings are CANCELLED; all other motions DENIED AS MOOT.
DONE AND ORDERED in Chambers at Miami, Florida, this 5th day of November, 2018.

For simplicity's sake, and because all relevant actions taken made by Mr. Shapiro were taken on behalf of Plaintiff, the Court refers to both as "Shapiro" or "Plaintiff."

The parties dispute the extent of automation, but as discussed in detail below, the dispute is not material. Additionally, the portion of this process that Plaintiff identifies as non-automated is related not to the electronic processes that identify the account and transfer the funds, but rather to procedures for screening for violations of United States' sanctions. See D.E. 53 ¶ 26; D.E. 64 ¶¶ 19, 26, 34-35.

On the subject of what "due diligence" required in this case, Plaintiffs have moved for the late entry of an expert report on this subject. The Court need not rule on that motion because the statute and case law make clear that Wells Fargo's processing of the wire transfer was appropriate.